IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS RINK,                              :
                                          :
              Plaintiff,                   :
                                          :
       v.                                 :        3:14-CV-02154
                                          :        (Judge Mariani)
NORTHEASTERN EDUCATIONAL                  :
INTERMEDIATE UNIT 19, LOUISE              :
BRZUCHALSKI, ROBERT                       :
SCHWARTZ, JOSEPH MURRACO,                 :
RICK BARONE, THOMAS CERRA,                :
CY DOUAIHY, ERIC EMMERICH,                :
HAROLD EMPETT, KATHLEEN                   :
GRANDJEAN, MICHAEL MOULD,                 :
ELLEN NIELSEN, CHRISTINE                  :
PLONSKI-SEZER                             :
                                          :
              Defendants.                  :

## MEMORANDUM OPINION

Before the Court is Defendants' Motion for Summary Judgment.  For the reasons

that follow, Defendants' Motion is granted.[1]

## I.    INTRODUCTION AND PROCEDURAL HISTORY

On November 11, 2014, Plaintiff Thomas Rink ("Rink") filed a Complaint against

Defendants Northeastern Educational Intermediate Unit 19, Louise Brzuchalski, Robert

Schwartz, Joseph Murraco, Rick Barone, Thomas Cerra, Cy Douaihy, Eric Emmerich,

---

[1] Because the Court is granting Defendants' Motion for Summary Judgment, Defendants' Motion to
Dismiss Count II of the Amended Complaint, (Doc. 45), is denied as moot.

Harold Empett, Kathleen Grandjean, Michael Mould, Ellen Nielsen, and Christine Plonski-Sezer (collectively, "Defendants"). (Doc. 1). Defendants moved to dismiss the complaint on December 8, 2014, (Doc. 19), and on December 15, 2015, the Court granted in part and denied in part Defendants' motion. (Doc. 39).

Rink filed an Amended Complaint on December 28, 2015, alleging five counts. Count I asserts that Defendants retaliated against Plaintiff for exercising his First Amendment rights. (Doc. 40, at ¶¶ 47-53). Count II claims that the Defendants violated Plaintiff's Fourteenth Amendment right to due process of law. (*Id.*, at ¶¶ 54-63). Count III alleges a civil conspiracy to deprive Plaintiff of his First and Fourteenth Amendments rights, (*Id.*, at ¶¶ 64-69), and Count IV alleges a violation of Pennsylvania's Whistleblower Act, 43 P.S. § 1422. (*Id.*, at ¶¶ 70-75).[2] On January 8, 2016, Defendants moved to dismiss Count II of the Amended Complaint. (Doc. 45). And on January 29, 2016, Defendants filed a Motion for Summary Judgment, seeking summary judgment on all counts. (Doc. 51).

## II.   STATEMENT OF FACTS

### A. The Parties

Plaintiff was employed with the Defendant Northeastern Educational Intermediate Unit 19 ("NEIU") since 1981. (Doc. 52, at ¶ 5). In late 1993, Plaintiff was appointed as the fiscal director of the NEIU. (*Id.*, at ¶ 13). Defendant NEIU is part of the public school system in the Commonwealth of Pennsylvania and provides statutorily mandated

---

[2] Count V alleged Wrongful Termination, but the parties have entered into a stipulation dismissing Count V. (Doc. 50).

educational services, such as the delivery of early intervention programs and services,

special educational programs, learning support, and life skills to school districts in

Lackawanna, Wayne, Wyoming, Pike and Susquehanna County. (Amended Compl., at ¶

10). The individual Defendants have all served as members of the Board of Directors of

NEIU. (*Id.*, at ¶ 3). In 1998, Fred Rosetti became Executive Director of the NEIU. (Doc.

52, at ¶ 14). At that time, none of the Defendants were Board Members. (*Id.*, at ¶ 24).

Eight of the Defendant Board members came onto the NEIU Board after Rosetti had left.

(Doc. 52-1, at 42). Plaintiff also testified that he was not aware of any relationship or ties

between Defendants Schwartz, Murraco, Barone, Douaihy, Empett, Mould, Nielsen,

Plonski-Sezer and Rosetti. (*Id.* at 43-44).

## B. The Rosetti Investigation

In June 2010, Fred Rosetti retired from his position with the NEIU. (*Id.*, at ¶ 6). At that

time, newspaper articles were run regarding what was seen as Rosetti's "very lucrative"

retirement benefits, in accordance with his employment contract.[3] (*Id.*, at ¶ 19); (Amended

Compl., at ¶ 18). Following Rosetti's retirement, his practices came under scrutiny and an

investigation in Rosetti and the NEIU's supervision of him was launched by the

Pennsylvania Department of the Auditor General, the U.S. Department of Education, and

the Federal Bureau of Investigation ("FBI"). (Amended Compl., at ¶ 19)

---

[3] Defendant Brzuchalski is a member of the Board NEIU. (Doc. 52, at ¶¶ 173-174). She testified that she was the individual who initially reported Fred Rosetti's payout to the newspaper and the Auditor General. (*Id.*, at ¶¶ 175-176).

As a result of the investigation, Plaintiff Rink was contacted by the Auditor General in late July 2010 and thereafter agreed to provide documents and assistance with the investigation. (Doc. 52, at ¶ 18).   On April 22, 2011, a representative of the U.S. Department of Education and the FBI appeared at Rink's home and served him with a subpoena to appear before the Assistant U.S. Attorney on May 18, 2011. (Amended Compl., at ¶ 22).   On that day, Rink went to the U.S. Attorney's office in Scranton, where he met with a U.S. Attorney, a representative from the Auditor General's office and, two FBI agents. (Id., at ¶ 24).   Rink subsequently met with investigators on multiple occasions to assist in the Rossetti investigation, which the investigators found to be very helpful.[4] (Id., at ¶ 25); (Doc. 58, at 29).   According to Plaintiff, it is around this time that the Board Members started plotting to have him terminated as a result of his cooperation in the Rossetti investigation.[5]   Moreover, at this time Michelle Olshefski, an Assistant US Attorney, had a conversation with the solicitor for the NEIU where she informed him that the NEIU should

---

[4] A number of other employees of the NEIU participated in the investigation, but Mr. Rink was the only employee terminated by the NEIU. (Id., at ¶¶ 21-22).

[5] Rink also testified that, following the revelations of Rossetti's financial misdeeds, he began to feel as if the Board Members were blaming him for not finding certain discrepancies in the NEIU's finances caused by Rossetti. (Id., at ¶ 30).   At a Board meeting in January 2011, Clarence Lamanna, then acting Executive Director of the NEIU, informed Rink that one of the Board Members, Louise Brzuchalski, thought that Rink should be fired. (Id., at ¶ 31).   According to Dr. Lamanna, Ms. Brzuchalski indicated that it was her belief that Plaintiff should be fired as a result of the Rossetti scandal because in similar situations the Chief Financial Officer is typically terminated, and that because he was the fiscal director at the time (and that he put the bills through to be paid), he should have been able to pick up on something. (Doc. 52, at ¶¶ 32, 36).   At this time, Rink had the perception that his job was in danger. (Id., at ¶ 33).   Specifically, when asked why he had that perception he testified that it was his "association with Rossetti. The fact that they feel that – like I should have picked up on what he was doing, or, I don't know, maybe gone and reported it to someone." (Id., at ¶ 34).

not take any adverse action against Mr. Rink because that would be interfering with a

federal investigation. (Doc. 58, at 29).

Rosetti was indicted for various financial improprieties arising out of his performance of

his job at Defendant NEIU on February 21, 2012. (Doc. 52, at ¶ 27). In October of 2012, he

pled guilty to theft and mail fraud charges and admitted to the misuse of taxpayer money.

(Id., at ¶ 28). Rink alleges that, shortly after Rosetti's indictment, the Board resumed its

agenda to terminate him, but before they could do so, they first needed to manufacture

cause in order to terminate his employment.

In March 2013, Rosetti was sentenced. At Mr. Rosetti's sentencing, Mr. Rink provided

the following statement, which forms, in part, the basis for his retaliation claim:

> As I've said, Your Honor, I've worked at the N.E.I.U. for the past 31 years, and I've
> been the Fiscal Director or Business Manager for the last 19. After 12 years of
> working in the data processing and fiscal departments, I took over the position of
> Fiscal Director in late 1993. It has been my honor and joy to serve the organization
> in this capacity, and I believe that my co-workers respect me for coming up through
> the ranks to this position.
>
> The staff in the Fiscal Office has been professional and cooperative and respect my
> commitment and worth ethic. In 1998, Fred Rosetti became Executive Director of
> N.E.I.U. 19. Dr. Rosetti had come to N.E.I.U. in July of 1990 as Assistant Executive
> Director and developed a reputation among the I.U. staff as being unpredictable,
> short-tempered, and not someone to get on the bad side of.
>
> While he and I had some conflicts, I made the best of it, and he was in line to be the
> next Executive Director. While he had little interest in financial operations, I kept him
> informed as well as possible as to the financial health and/or potential problems of
> the organization, during his time as Executive Director.
>
> During that first year in office, it became quite obvious that the Board of Directors
> exercised little oversight over his activities. Monthly meetings were completed in an

5

hour or less, nearly every vote was unanimous, and I was often shocked over the years how some agenda items that I thought to be deserving of some debate would pass unanimously, with not even a question. It was quite obvious who was running the show.

In May of 1999, near the end of his first year in the Executive Director position, Dr. Rosetti threatened to fire me and clear out my whole department over a seemingly minor question raised by a member of my office staff. While things quieted down afterwards, it was quite clear to me that I had better be cautious in my dealings with this man. That same day, I sought out legal counsel, and was told that Pennsylvania was an employment at-will state, and that, unless I had an employment contract, I could be terminated at any time.

I resigned myself at that time to tread lightly and cautioned my office staff to be careful what they said outside of our department. Over the 12 years of his time as Executive Director, I did my job, to the best of my ability, and developed a good reputation with the many auditors that I dealt with. The audits of N.E.I.U. were always favorable, and the few problems pointed out were dealt with and corrected.

While I was never one of the man's favorite people, the audits showed that the Fiscal Office was doing its job. However, as the twelve years went on, there were more and more bills that were connected to Dr. Rosetti that seemed questionable.

On some occasions, I would ask some questions, but he would say it was legitimate. An example would be a night that was spent for the I.U. employees at the County Commissioners box at the Lackawanna County Stadium. A catering charge for several hundred dollars appeared on the company credit card for that night. When I asked how to charge it, I was told it was for a staff meeting. As directed to do so, I processed the bill, and it was passed by the Board without question or comment.

During the last two and a half years, I've cooperated fully and actively participated in the investigation of Dr. Rosetti. Though never under investigation myself, I hired an attorney, because I have had to deal with the Auditor General, the FBI, and the United States Attorney.

They quickly saw that I was not a willing party in these schemes and understood that I was a victim working in a hostile work environment. Although, this matter has been thoroughly investigated and handled through the Court system, there are those who continue looking at me as a scapegoat, as well as debating my continued employment in my current position.

For the first 29 years of my service at N.E.I.U. 19, I built a solid reputation of conscientiousness, integrity and cooperation with my co-workers at N.E.I.U., as well as our 20 member school district. While many of the people don't realize that I was part of the collateral damage. There are those who feel that I have failed, in some way, and should be removed from this position that I have enjoyed having so much over the years.

My health has been affected to the point that I have suffered from stress, many sleepiness nights, and a lack of appetite has affected me off and on since this investigation began in the summer of 2010.

For many, this matter will end with the sentencing here today. I can assure you that it will not for me, the other employees of N.E.I.U. and others who have worked for Dr. Rosetti for many years. The fall-out from his actions has had and will continue to have a negative affect on our health, our well-being and our future careers.

This statement is the only public statement made by Rink and the only statement made under oath. (*Id.*, at ¶ 69).

## C. The NEIU Audits

Shortly after the Rosetti indictment, Rink alleges that the Board resumed its agenda to terminate him. It did so in various ways. First, the Board fired their current auditor, which had one year left on its contract, and hired Brian T. Kelly & Associates in June 2012 as the new auditors. With respect to the hiring of new auditors, Dr. Lamanna testified that he believed the Board wanted new faces, and that there were concerns about the Rosetti issue. (*Id.*, at ¶ 76). Second, it is around this time that the NEIU Board established several committees, at the recommendation of Executive Director Clarence Lamanna, including the finance committee, which monitored Rink's performance. (*Id.*, at ¶ 40). Rink speculates that the Board members encouraged the new auditors to find fault in his practices, even if

7

the problems they identified were minor and correctable, so they could fabricate a reason to

terminate him due to his cooperation and testimony in the Rosetti investigation.

In November 2012, the Board met with the new auditors:  Brian Kelly, Brad Murray, and

Larry Mattern of Brian T. Kelly & Associates.  (*Id.*, at ¶ 41).  At that meeting, Brian Kelly

discussed that in his opinion the state of the books at NEIU were unauditable.  (*Id.*, at ¶ 42).

Mr. Kelly testified that when they looked at the records of the NEIU as of June 30, 2011, the

balances, final balance sheets, and fund balances did not agree with the issued financial

statement of June 30, 2011.  (*Id.*, at ¶ 92).  He further testified that when his firm was

retained in 2012, they were not given any instructions regarding Rink, (*Id.*, at ¶ 103), nor did

anyone on the Board ever ask him to go after Rink.  (*Id.*, at ¶ 104).  And no member of the

Board ever came to Mr. Kelly and encouraged him to find fault with Rink's practices.  (*Id.*, at

¶ 108).  When Mr. Kelly's firm was first retained by the NEIU, there were no discussion

about Mr. Rink's involvement in the Fred Rosetti investigation., (*Id.*, at ¶ 120), and Mr. Kelly

had no knowledge that Mr. Rink testified against Fred Rosetti.  (*Id.*, at ¶ 121).

The Kelly firm's 2012 audit report found multiple deficiencies in the NEIU books,

including:  (1) Plaintiff back dated checks; (2) Plaintiff left the books open after June 30th,

the close of the fiscal year; (3) there were issues with the recovery of indirect costs; and (4)

there were 226 adjusting journal entries in the 2012 audit.  (*Id.*, at ¶¶ 112-116).  The 2012

audit also found that the NEIU body shop should have been collecting sales tax.  (*Id.*, at ¶

52).  Moreover, the auditors needed to make an adjustment for the overstatement of social

security tax liability because a 2% reduction in payroll tax liability was not taken into consideration. (*Id.*, at ¶ 118). Additional issues with Rink's accounting practices include the underreporting of a Verizon bill in 2012 in the amount of $449,000 (which happened again in 2013 in the amount of $229,000) as well as Rink's failure to record early retirement incentive payments up to $127,000. (*Id.*, at ¶ 156). From 1994 through June 2012, the prior NEIU auditors only found one issue with Rink's practices during the NEIU audits. (Doc. 58, at 27).

Mr. Murray, an associate at the Kelly firm, corroborated Mr. Kelly's findings and testimony. He testified that it was his opinion that the NEIU books were unauditable, and that the books and records were not reasonably adjusted and did not accurately reflect a number of items that should have been recorded. (Doc. 52, at ¶¶ 128-129). With respect to the way Rink calculated the NEIU's indirect costs, Murray testified that the Bureau of Audits in Harrisburg told him that the way the NEIU did this was incorrect and was "double dipping." (*Id.*, at ¶ 130). When asked by Dr. Lamanna why certain findings in the 2012 audit were not found by the previous auditors, Mr. Murray responded that the audits were deficient, that all these items previously existed, and that if the previous auditors properly followed and applied accounting standards they should have found all the same issues and raised them. (*Id.*, at ¶ 131). Mr. Murray also echoed Mr. Kelly's testimony that, when the firm was hired back in 2012, they were not given any instructions by the Board with regard to Rink, that they never developed a friendly relationship with any Board members when

they started the audit, and that no Board members encouraged them to find fault in Mr. Rink's practices. (*Id.*, at ¶¶ 132-34). Moreover, none of the Board members ever discussed Mr. Rink's testimony against Fred Rosetti with Mr. Murray.[6] (*Id.*, at ¶ 135).

### D. Plaintiff's Employment Is Not Renewed

After receiving the audit report, Ms. Brzuchalski testified she considered taking action against Mr. Rink due to the hundreds of adjusting entries, and, because the calculation of indirect costs was done incorrectly, it cost the NEIU hundreds of thousands of dollars. (*Id.*, at ¶¶ 182-183). However, in July 2013 Plaintiff was instead given a corrective action plan by Dr. Lamanna. (*Id.*, at ¶ 50). At that time, Dr. Lamanna told Plaintiff that he should focus on the findings of the 2012 audit, and that if he did not correct those findings, he would be terminated. (*Id.*, at ¶ 51).

The following year's audit revealed that Rink made progress on the corrective action plan. (Doc. 58, at 34). Out of the thirteen written findings in the 2011-2012 audit report, only five remained outstanding at the time of the 2012-2013 audit. (*Id.*). There were also significantly fewer adjusting journal entries in 2013. (*Id.*).

Nevertheless, in January 2014 the NEIU solicitor recommended that the Board hire an independent third party to come in and review Plaintiff's employment. (Doc. 52, at ¶ 78). In

---

[6] Although Plaintiff testified it was his belief that Brian Kelly's firm was hired by the Board to find fault in his practices, he testified that Dr. Lamanna never told him about any conversations where the Board members directed someone at the Kelly firm to find fault in his practices. (*Id.*, at ¶ 55). He also testified that he was not aware of any meetings amongst the Defendants where they came up with a plan to terminate him. (*Id.*, at ¶ 70).

February 2014, NEIU offered Mr. Rink an early retirement package which he was informed

he should either take or that the Board would bring in an independent consultant to point out

all the mistakes he had made as fiscal director and initiate proceedings to terminate him for

cause. (*Id.*, at ¶ 58); (Doc. 58-5). Plaintiff did not accept the retirement package.

The Board subsequently hired George Shovlin, a former certified public accountant and

lawyer who performs work in employment benefits and education law. (*Id.*, at ¶¶ 138-139).

Mr. Shovlin was hired to conduct an independent examination of Mr. Rink and the activities

of the business department at the NEIU. (*Id.*, at ¶ 144). He was also tasked with looking at

the business department and determining whether there were any issues that may result in

a suspension, improvement plan, or even termination. (*Id.*, at ¶ 145). Mr. Shovlin testified

that based on multiple issues raised in his examination, as well as the materiality and

number of those issues, he believed that they warranted, if the Board choose to do so,

termination of Mr. Rink's employment. (*Id.*, at ¶ 147). Although Mr. Shovlin agreed that Mr.

Rink had made improvements from 2012 to 2013, significant issues still remained. (*Id.*, at ¶

152). He further testified that if he had a company with a $45 million budget, he would not

be confident in Plaintiff as CFO or Business Manager of that company. (*Id.*, at ¶ 153). He

also testified, like members of the Kelly firm, that none of the Board members ever

suggested any findings he should make in his investigation, that there was no discussion

about a relationship between Rink and Fred Rosetti, and that he had no knowledge of Mr.

Rink's involvement in the Fred Rosetti investigation when he was hired. (*Id.*, at ¶¶ 165-168).

Mr. Shovlin presented his findings to the entire NEIU Board on May 20, 2014. (*Id.*, at ¶ 158). He identified a number of issues with respect to Plaintiff's accounting practices and it was his opinion that these issues were sufficient to terminate Mr. Rink for cause. (*Id.*, at ¶ 171). That same day, the Board voted not to renew Rink's employment as of June 30th, 2014, the end of the fiscal year. (*Id.*, at ¶ 59). It was Ms. Brzuchalski who made the motion to not renew Rink's employment, testifying that the Board decided not to renew Rink's employment, rather than dismissing him for cause. (*Id.*, at ¶¶ 187-189). All twelve members of the NEIU Board voted in favor of not renewing Rink's employment. (*Id.*, at ¶ 60). On May 21, 2014, a letter was sent to Rink informing him that his employment would not be renewed. (*Id.*, at ¶ 86). It is undisputed that Rink never had a written contract governing his employment with the NEIU, and that it was his belief that his term of employment was perpetual. (Doc. 58, at 26).

In late June 2014, Mr. Rink received a letter from the NEIU solicitor informing him of a hearing regarding his termination for cause. (*Id.*, at ¶ 67). At some point after his employment was not renewed, Rink was charged and was provided a hearing. (*Id.*, at ¶ 192). However, Mr. Rink never attended the hearing. (*Id.*, at ¶ 68.). As a result of the hearing, an adjudication and determination were made to terminate Mr. Rink for cause. (*Id.*, at ¶ 192). A motion was made and passed on September 23, 2014, to dismiss Mr. Rink for

neglect of duty effective at the conclusion of June 30, 2014. (*Id.*, at ¶ 193). At the October 2, 2014, Board meeting a motion was made to amend the adjudication to indicate that Rink was fired for cause as of June 20, 2014. (*Id.*, at ¶ 204).

## III.   STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L.Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support

the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should

be granted, "[t]he court need consider only the cited materials, but it may consider other

materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light

most favorable to the non-moving party, and where the non-moving party's evidence

contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW,*

*Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912

(1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if

there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct.

1769, 167 L.Ed.2d 686 (2007). If a party has carried its burden under the summary

judgment rule:

> its opponent must do more than simply show that there is some
> metaphysical doubt as to the material facts. Where the record taken as a
> whole could not lead a rational trier of fact to find for the nonmoving party,
> there is no genuine issue for trial. The mere existence of some alleged
> factual dispute between the parties will not defeat an otherwise properly
> supported motion for summary judgment; the requirement is that there be
> no *genuine* issue of *material* fact. When opposing parties tell two different
> stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of
> the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV.   ANALYSIS

Rink's claims arise under both federal and state law and stem from Defendants' failure

to renew his employment in May 2014. In Count I Rink asserts, pursuant to 42 U.S.C. §

1983, that Defendants retaliated against him in violation of the First Amendment when his employment with Defendants was not renewed in May 2014 as a result of his participation in the Rosetti investigation. In Count II Rink claims that was deprived of his due process rights guaranteed by the Fourteenth Amendment. Count III asserts a civil conspiracy claim against the Defendants, and in Count IV Rink asserts that his discharge also violated Pennsylvania's Whistleblower Act, 43 P.S. § 1422. The Court will first address Rink's retaliation claim.

## A. First Amendment Retaliation

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 749 n.9, 119 S. Ct. 1624, 143 L.Ed.2d 882 (1999) (internal citation and quotation marks omitted). In order to state a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must show "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."[7] *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).

---

[7] The Third Circuit has also characterized a claim for First Amendment retaliation as requiring a showing that "(1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015) (internal citation and quotation marks omitted). Regardless of the standard applied, as discussed more fully below, Rink cannot demonstrate a

Even if all three elements are satisfied, the Defendants can defeat Rink's claims "by

showing that [they] would have taken the same action even if the plaintiff had not engaged

in the protected activity." *Lauren W v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citing

*Ambrose v. Twp. Of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002)).

The parties agree that the first two elements of Rink's First Amendment retaliation claim

are not in dispute. *See* July 7, 2016, Hr'g Tr. at 9:11-17; 10:17-11:1. The sole dispute,

therefore, is whether Rink has offered evidence from which a reasonable factfinder could

infer a causal link between his constitutionally protected speech and the retaliatory action.

"To establish the requisite causal connection a plaintiff usually must prove either (1) an

unusually suggestive temporal proximity between the protected activity and the allegedly

retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal

link." *Lauren W*, 480 F.3d at 267 (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04

(3d Cir. 1997)). "In the absence of that proof the plaintiff must show that from the evidence

gleaned from the record as a whole the trier of the fact should infer causation." *Id.* (internal

citation and quotation marks omitted). "The showing of causation is critical. Summary

judgment will be granted on a First Amendment retaliation claim when there 'is simply no

basis in the evidence' to make the causal link." *Garcia v. Newtown Twp.*, 483 F. App'x 697,

702 (3d Cir. 2012) (quoting *Lauren W*, 480 F.3d at 272). Indeed, the Third Circuit has

recognized that:

---

causal connection between his protected speech and the Defendants' decision to not renew his
employment.

A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in an individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation from his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the court to second guess the actors' decisions.

*Lauren W*, 480 F.3d at 267-68.

The Court finds that, viewing the evidence in the light most favorable to Rink, there is simply no basis in the evidence from which a reasonable factfinder could infer a causal connection between Rink's protected activity and the Board's decision to not renew his employment. To survive summary judgment, "a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue," which Rink has failed to do. *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (internal quotation marks omitted) (citing *Celotex Corp.*, 477 U.S. at 325). And although the issue of causation, "present[s] questions of fact for the jury, only *genuine* questions of fact should be determined by the jury." *Hill v. City of Scranton*, 411 F.3d 118,

127 (3d Cir. 2005) (emphasis in original). Here, there is no genuine dispute of material fact with respect to the causation element for the following reasons:

*First,* the temporal proximity between Rink's protected activity and his termination, well over a year, is insufficient for a fact-finder to infer causation. "For temporal proximity alone to establish causation, the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Conklin v. Warrington Twp.,* Civil Action No. 1:06-CV-2245, 2009 WL 1227950, at *3 (M.D. Pa. Apr. 30, 2009) (internal citation and quotation marks omitted). Although the "mere passage of time is not legally conclusive proof against retaliation . . . the passage of a long period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period." *Shaner v. Synthes,* 204 F.3d 494, 505 (3d Cir. 2000).

*Second,* "there is no evidence in the record to establish causation through a 'pattern of antagonism coupled with timing.'" *Gulick v. City of Pittson,* 995 F. Supp. 2d 322, 336 (M.D. Pa. 2014) (quoting *Lauren W,* 480 F.3d at 267). The only evidence in the record concerning a pattern of antagonism is Rink's testimony concerning his own, subjective, and conclusory beliefs that a pattern of antagonism developed following his participation in the Rosetti investigation. This is insufficient to preclude summary judgment on the issue of causation. *See Petro-Ryder v. Pittman,* Civil Action No. 15-2908, 2015 WL 8731623, at *16 (E.D. Pa. Dec. 11, 2015) (granting summary judgment on retaliation claim where plaintiff "has no

evidence other than her subjective belief" to support causal connection between protected activity and retaliatory action); *see also* Kovac *v. Pennsylvania Turnpike Comm'n*, 444 F. App'x 588, 591 (3d Cir. 2011) (affirming summary judgment for Defendant when Plaintiff's only evidence supporting causation was his own "vague, speculative, and conclusory" testimony); *Lexington Ins. Co. v. Western Pennsylvania Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) ("Speculation does not create a genuine issue of fact.") (internal citation and quotation marks omitted). In particular, Plaintiff speculates that the Board hired new auditors and instructed them to find fault with his practices. However, all the evidence plainly contradicts Rink's speculative beliefs. Specifically, Brian Kelly, Brad Murray, and George Shovlin all testified that nobody at the NEIU ever asked them to find anything wrong with the practices of Mr. Rink, and that all of their opinions were based upon their professional judgment. *See Lauren W*, 480 F.3d at 272 ("The fact is that in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness."). Both Mr. Kelly and Mr. Murray testified that when they looked at the records of the NEIU, they found the books to be "unauditable" and that Plaintiff had poor accounting practices such as back dating checks and leaving books open after the end of the fiscal years. (Doc. 52-3, at 30-33; 85-86); (Doc. 52-4, at 38-39). Despite Rink's speculation, there is nothing in the record to establish that the Kelly firm's findings were requested by the Defendants as part of a larger plan to create evidence against Rink as a result of his participation in the Rosetti

investigation. Nor does the fact that prior auditors of the NEIU failed to find significant flaws in Rink's accounting practices suggest that the Kelly firm was hired by the Board to find flaws in Rink's accounting practices as a result of his testimony against Rosetti.

Rink also testified that Dr. Lamanna, the former Executive Director of the NEIU, informed him of conversations the Board had concerning him. But Dr. Lamanna never told Rink about any conversations where the Board members directed someone at the Kelly firm to find fault with Rink's practices. Moreover, there is no documentary evidence to support Rink's conclusory and speculative assertions that the auditors findings were related to his testimony against Rosetti. Notably, many of the actions that Rink complains of—such as an alleged conspiracy to fire the old auditors and hire new ones to find flaws in Rink's practices—occurred *prior* to his protected speech at Rosetti's sentencing where he criticized the Board. Specifically, Rink's testimony at Rosetti's sentencing occurred on March 5, 2013—which is nine months *after* the Board hired the Kelly firm.[8]  *See* July 7, 2016 Hr'g Tr. at 8:25-9:4.

---

[8]      At oral argument counsel for Rink offered his best "proof" to demonstrate a pattern of antagonism and pointed to the hiring of Brian Kelly and his firm as auditors in 2012, which he claimed was done for "a specific purpose to retaliat[e] against Mr. Rink." July 7, 2016, Hr'g Tr. at 45:21-46:2. But counsel fails to recognize that the hiring of the Kelly firm took place *nine months prior to the protected speech at issue.*

In addition, counsel stated:

The thing that I think you can infer – again, I keep using the word, infer --- but I think what can be gleaned from the evidence, in this particular case, is why the need to hire Brian Kelly? You had Tom Rink, who, by the way, for many, many, many, many years, at least, I think it was 11 or 12 years, had his audits peer-reviewed, and those peer reviews never came back that there were any findings. So I say, Your Honor – and this is the theme of my case - - that there was no reason to

20

In addition, Plaintiff speculates as to the Defendants' retaliatory motive when they hired George Shovlin to perform an independent investigation of Plaintiff and the NEIU business department in 2014. But Mr. Shovlin testified that when he was hired he was given a clean slate and that nobody at the Board told him how they would like to see the investigation go. (Doc. 52-5, at 94-95). None of the Board members suggested any finding they wanted him to make, nor were there any discussions about any relationship between Rink and Rosetti. (*Id.*). Mr. Shovlin's investigation lead him to conclude that based on a number of issues with Rink's accounting practices, as well as the materiality and number of those issues, it was his professional opinion that if the Board so chose, it would be appropriate to terminate Rink's employment. (*Id.* at 22). Shovlin further testified that if he had a company with a $45 million budget, he would not be confident in Rink as CFO or Business manager, (*Id.* at 39), pointing to the over accrual of social security tax, the failure to record early retirement incentive payments, the underreporting of the Verizon bill in 2012 and 2013, as well as the failure to collect sales tax, among other things. Rink's speculative belief regarding the hiring of the Kelly firm and George Sholvin, and their resultant critical evaluations of Rink's accounting practices, are insufficient to demonstrate a pattern of antagonism coupled with timing.

---

hire Brian Kelly, there was no reason to hire George Shovlin, except as to create a smoke screen, okay, for the impetus to go ahead and terminate.

July 7, 2016, Hr'g Tr. at 46:6-17.

*Finally*, because Rink cannot establish a causal connection between his protected activity and his termination through "unusually suggestive temporal proximity" or a "pattern of antagonism coupled with timing," he must show that the trier of fact could infer causation from the "evidence gleaned from the record as a whole." *Lauren W*, 490 F.3d at 267. "Where the time between the protected activity and the adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence . . . that give rise to an inference of causation when considered as a whole." *Marra v. Philadelphia Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (citations omitted).

Here, when considering the record in its entirety, a reasonable finder of fact could not infer a causal connection between Rink's participation in the Rosetti investigation and his termination. In the Amended Complaint, Plaintiff avers that "Defendants retaliated against Plaintiff for exercising his First Amendment rights in testifying against Rosetti, by harassing and firing Plaintiff." (Amended Compl., at ¶ 48). Those allegations, however, are plainly contradicted by Plaintiff's own testimony in which he categorically states that he has no evidence that links any of the Defendant Board members with Rosetti. (Doc. 52-1, at 312-313). The allegations in the Amended Complaint are also directly contradicted by the testimony of the Defendants, as well as members of the Kelly firm and George Sholvin. Moreover, Rink testified that Dr. Lamanna informed him that Defendant Brzuchalski "was

pushing for his termination" back in January 2011 because "she felt that [he] needed to go, simply because in a lot of companies when something like this happens, the Chief Financial Officer is either fired or asked to resign." (*Id.* at 313). That was over two years prior to Rink's testimony at Rosetti's sentencing hearing, and months before Rink received a subpoena from the US Attorney's Office. Moreover, although Rink testified that Defendant Brzuchalski was one of his biggest critics on the board and part of the alleged conspiracy to terminate him for testifying against Rosetti, those allegations make little sense when one considers that Ms. Brzuchalski was the original whistleblower against Rosetti who requested his contract, called the newspaper, and reported Rosetti to the Auditor General. (Doc. 52-6). In fact, Rink flatly admitted that he was not contending that Ms. Brzuchalski took any actions to benefit Rosetti.[9] Rink has also failed to explain why he was the only participant in

---

[9] The following exchange took place at Mr. Rink's deposition:

> Question:  I think we talked about this on day one, but I want to be sure.  Do you have any evidence that links any of these Board members to Fred Rosetti?
>
> Answer:  The general information that I was receiving from Clarence Lamanna starting in January of 2011.
>
> Question:  What information was that?
>
> Answer:  Well, that Louise Brzuchalski was pushing for my termination back then, that she felt that I needed to go simply because, in a lot of companies where something like this happens, the chief financial officer is either fired or asked to resign.
>
> Question:  But that's Louise saying that you should go because of that, because that's the way it's done in bigger companies and perhaps she attributes some fault to you?
>
> Answer:  Yes.

the Rosetti investigation, among approximately five others, who was terminated.  As the

Court recognized at oral argument:

> When I see the allegations of the complaint and then I see Mr. Rink's testimony, and
> particularly, his testimony that he's not saying that Louise Brzuchalski was trying to
> protect Rosetti, it seems to me that I would understand that testimony to be that
> there's not a claim by Mr. Rink that the actions taken against him were taken by the
> board members in an effort to get revenge for his testimony against Rosetti, or taken
> in an effort to even the score or to support Rosetti, in any way, but instead of it being
> an action taken to punish him for his testimony about Rosetti, it was an action that
> was taken because he didn't catch what they thought should have been caught, by
> way of Rosetti's improprieties.

July 7, 2016, Hr'g Tr. at 33:17-34:4.  In response, counsel for Rink agreed that "that's one of

the inferences that you can take from the testimony that Mr. Rink's, through the course of

discovery in this case, that we were not able to get any of the board members who voted to

not renew, to come right out and say that was the reason, I can see the inference." *Id.* at

34:6-14.[10]

---

> Question:  *All right.   You're not saying Louise started saying that because she was
> somehow trying to protect Rosetti, are you?*
>
> Answer.  *No.*

(Doc. 52-1, at 313-314).

[10] Counsel for Rink then pointed to the testimony of AUSA Michelle Olshefski as the only
independent witness who he claimed offered supporting testimony that he was terminated based on his
participation in the Rossetti investigation.  But upon closer examination, AUSA Olshefski's testimony does
no such thing:

> Question:  When you say blame, obviously, you said he wasn't involved in Rosetti's scheme.  Are
> they [the Board] blaming him for not finding Rosetti's scheme?
>
> Answer:  I don't know who they were blaming.  My recollection and my feeling, at the time, was that
> the N.E.I.U. was being exposed publicly, and that their Executive Director was the one who was
> being investigated, and they stamped and signed everything that their Executive Director did, so in
> terms of holding people accountable, we wanted to make sure the right person was held

In sum, the Court finds that Rink has offered no evidence from which a reasonable trier of fact could conclude that his participation in the Rosetti investigation was causally connected to his termination.[11]  Viewing all of the evidence in the light most favorable to Rink, at most, the record suggests—and Rink testified to—that he was terminated as a result of his failure to catch Rosetti's financial practices and other accounting irregularities discovered by the auditors.  See July 7, 2016 Hr'g Tr. at 12:1-13:20; 38:1-22.  Accordingly, the Court with grant Defendants' Motion for Summary Judgment with respect to the Count I.

## B. Pennsylvania Whistleblower Act

In Count IV Rink asserts a claim under Pennsylvania's Whistleblower Act.  The statute provides, in relevant part:

---

accountable.  Who wanted to hold him accountable?  I don't know.  But the sense was they were trying to hold others criminally responsible or accountable for the actions of one man.

Question:  When you say hold accountable, you're referring to it in the context of the Federal Criminal Statutes when you say he is not to blame, correct?

Answer:  *I can only speak from the perspective of criminal liability.  We never reviewed Mr. Rink as a target.  He was a cooperating witness with us and was tremendously helpful to us in advancing our investigation.  I can't speak in terms of anything else.*

(Doc. 58-1, at 34-35) (emphasis added).

As the Court recognized as oral argument, "while her testimony does point out that the board was, as she puts it, essentially, approving whatever came their way for Mr. Rosetti, I don't know, necessarily, that she provides the kind of link that would allow me to say that, based on her testimony, there's a material issue of fact as to whether he was retaliated against, based on that testimony."  July 7, 2016 Hr'g Tr. at 35:25-36:5.

[11] Moreover, the record plainly establishes that the Defendants' would have terminated Rink even if he had not engaged in any activity protected under the First Amendment based on the multiple material findings of the audits.

    (a) Person not to be discharged – No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined by this act.

    (b) Discrimination prohibited – No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee is requested by an appropriate authority to participate in an investigation, hearing or inquiry held by an appropriate authority or in a court action.

42 P.S. § 1423(a)-(b).

"To establish a prima facie case under the Pennsylvania Whistleblower Law, the plaintiff must establish that he made a good faith report of wrongdoing or waste to the appropriate authorities prior to the alleged retaliation." *Drumm v. Triangle Tech, Inc.*, 4:15-CV-00854, 2016 WL 13848886, at *9 (M.D. Pa. Apr. 7, 2016). The Plaintiff also "'must come forward with some evidence of a connection between the report of wrongdoing and the alleged retaliatory acts.'" *Mosley v. City of Pittsburg Pub. Sch. Dist.*, 702 F. Supp. 2d 561, 583 (W.D. Pa. 2010) (quoting *O'Rourke v. Commonwealth*, 566 Pa. 161, 778 A.2d 1194, 1200 (Pa. 2001)); *accord Anderson v. Bd. of Sch. Directors of Millcreek Twp. Sch. Dist.*, 574 F. App'x 169, 173 (3d Cir. 2014). The connection "may not be predicated upon vague and inconclusive circumstantial evidence." *Sea v. Seif*, 831 A.2d 1288, 1293 n.5. (Pa. Cmwlth. 2003) (internal citation and quotation marks omitted). Rather, Rink "must show by concrete facts or surrounding circumstances that the report of wrongdoing or waste led to [his]

dismissal, such as that there was specific direction or information received not to file the report or that there would be adverse consequences because the report was filed." *Golaschevsky v. Dep't of Envtl. Prot.*, 554 Pa. 157, 720 A.2d 757, 759 (Pa. 1998) (internal citation and quotation marks omitted). The standard under the Pennsylvania Whistleblower statute is "more stringent than the one for a First Amendment retaliation claim." *Cavicchia v. Philadelphia Housing Auth.*, 137 F. App'x 495, 497 (3d Cir. 2005).

For the reasons set forth above, *supra* at Part IV(A), Rink cannot establish a causal connection between his report of wrongdoing and his termination and therefore his claim under the Pennsylvania Whistleblower Act fails. *See Lee v. Comhar Inc.*, 244 F. App'x 464, 467 (3d Cir. 2007) ("Because Appellant has failed to demonstrate a causal connection between the filing of his complaints and his subsequent termination, and because Appellee has offered a legitimate reason for Appellant's termination, we conclude that the District Court correctly entered summary judgment in favor of Appellee on this claim."). *See also Moyer v. PA Turnpike Comm'n*, No. 1:10-CV-0456, 2010 WL 5174963 (M.D. Pa. Dec. 15, 2010) (holding that the Plaintiff failed to establish a causal connection between the report of wrongdoing and the adverse action and that Defendant was entitled to summary judgment). Accordingly, the Court will grant Defendants' Motion for Summary Judgment with respect to Count IV.

## C. Procedural Due Process

The Court will next address Rink's claimed deprivation of procedural due process rights alleged in Count II. "To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (internal citation and quotation marks omitted). "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S. Ct. 1487, 84 L.Ed.2d 494 (1985) (quoting *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972)).

Rink asserts that he possessed a property interest in his continued employment with the Defendant NEIU. "To have a property interest in a job . . . a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment." *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (citing *Roth*, 408 U.S. at 577). The Third Circuit has recognized that "[t]he hallmark of a constitutionally protected property interest is an individual entitlement that cannot be removed except for cause." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1078 (3d Cir. 1990) (internal citation and quotation marks omitted). Because State law creates property interests protectable by the Fourteenth Amendment's Due Process Clause, the

Court must look to Pennsylvania law to determine whether Rink had a property interest in his continued employment with the NEIU. "Pennsylvania has long subscribed to the at-will employment doctrine. Exceptions to the doctrine have generally been limited to instances where a statute or contract limits the power of an employer unilaterally to terminate the employment relationship." *Knox v. Bd. of Sch. Directors of Susquenita Sch. Dist.*, 585 Pa. 171, 183, 888 A.2d 640 (2005). When an individual is at-will employee, it means that "an employer may terminate an employee for any reason at all, unless restrained by contract." *Sullivan v. Chartwell Inv. Partners, L.P.*, 873 A.2d 710, 716 (Pa. Super. 2005) (internal citation and quotation marks omitted).

According to Rink, because he had an expectation of continued employment, he could not be terminated without compliance with Section 10-1089 of the Public School Code of 1949, 24 P.S. § 1-101 *et seq.*, which governs school business administrators. *Knox v. Bd. of Sch. Directors of Susquenita Sch. Dist.*, 585 Pa. 171, 888 A.2d 640 (2005). The statute provides, in relevant part:

(a) A governing board of a school entity may employ or continue to employ a person serving in the function of business administrator of the school entity who shall perform such duties as the governing board may determine, including, but not limited to, the business responsibilities of section 433 of this act.

(b) The governing board may enter into a written employment agreement with a person hired after the effective date of this section to serve as a business administrator or into an amended or renewed agreement with a person serving in that function as of such effective date. The agreement may define the period of employment, salary, benefits, other related matters of employment and provisions of renewal and termination of the agreement.

(c) Unless otherwise specified in an employment agreement, the governing board shall, after due notice, giving the reason therefor, and after hearing if demanded, have the right at any time to remove a business administrator for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth or other improper conduct.

24 P.S. § 10-1089(a)-(c).

In *Knox*, the Pennsylvania Supreme Court, interpreting § 10-1089(c), found that the statute applies "equally to business administrators with or without written employment agreements."

*Knox*, 585 Pa. at 186. The Court further noted that:

Our holding that the Commonwealth Court erred in its broad determination that Section 10-1089(c) applies only to written employment agreements, however, does not entirely resolve this appeal. The Board is correct that this statute, again by its plain terms, is addressed only to the 'removal' of school business administrators. The statute does not purport to confer any extra-contractual rights to continued employment or tenure beyond what the parties may have agreed to—in writing, orally, or as a matter of history and experience. Thus, Section 10-1089(c) does not provide a school business administrator with employment for life absent misconduct falling into one of the enumerated statutory circumstances. As this Court noted in *Scott*, 'where the legislature has intended that tenure should attach to public employment, it has been very explicit in so stating.' *Scott*, 166 A.2d at 281. To read into Section 10-1089(c) any such explicit legislative grant of tenure in the position of school business administrator is to go beyond what the statute provides.

Rather, Section 10-1089(c) merely provides a business administrator with a certain degree of job security against removal during the term of his employment, whatever that term, as established by the agreement of the parties, might be.

*Id.* at 186-87.

In the instant matter, the Court finds that Section 10-1089(c) does not apply on these facts. *First*, Rink was not *removed* from his position. Rather, the Board made a decision not to renew his employment at the May 2014 Board meeting. *Second*, it is clear that Rink

was an at-will employee, and the Board merely voted not to renew his employment contract. The parties agree that Rink did not possess a written employment contract with the NEIU, and Rink has pointed to no facts evidencing that he entered into an oral contract with the NEIU for a specified term sufficient to give rise to a property interest in his position.[12]  Nor is there any evidence in the record to establish Rink's expectation of continued employment based upon the NEIU's policies and practices. *Third*, even Rink's own testimony at Rosetti's sentencing hearing demonstrates that he was aware that his employment status is that of an at-will employee.

*Finally*, the Court notes that at oral argument Rink's counsel took the position that because Rink had "an expectation of continued employment" the protections of the statute "must be afforded to the employee, based upon the history, and as I indicated, the history here has been that every year, Mr. Rink's employment continued." July 7, 2016, Hr'g Tr. at 49:11-15. "If you look at the course in history of the way that Mr. Rink's employment occurred, every year his employment would come up and every year it would be renewed, so there was no reason, in 2014, but for everything else that occurred with Rosetti, that the board would not renew, in this particular instance, unless they were upset about something

---

[12] Unlike other employees that Courts have found to possess a property interest in their employment based on an oral contract or history and practice, Rink has pointed to no evidence that the parties had agreed to a specific term for his employment.  In those cases, "[t]he circumstances supported a finding that the plaintiff retained a property interest in her employment because the plaintiff had been told by the administrator that her employment would be sustained over a particular period of time." *Tremblay v. Delaware Cnty.*, No. Civ. A. 04-2740, 2005 WL 1126960, at *3 n.6 (E.D. Pa. May 11, 2005) (citing *Farr v. Chesney*, 436 F. Supp. 521, 528 (M.D. Pa. 1977)).

that he had said publicly against them. So I think it was every expectation of everyone that

his employment would continue." *Id.* at 50:1-10. He further noted that:

> there was an expectation, unless Mr. Rink committed some act of wrongdoing or
> neglect of duty or was otherwise incompetent under the statute, there was every
> expectation that his employment was going to continue. So when I'm standing in
> front of the jury, what I'm going to argue is, based on the history of his employment,
> based upon the way it was always done at N.E.I.U., that every year, there was – I
> don't think you can call it a one-year term, I don't think you can it any term, there was
> an expectation that his employment would continue. Is it perpetual? I think it's a
> perpetual expectation on both sides, unless you commit acts of wrongdoing.

*Id.* at 50:23-51:7. The Court disagrees. It is black letter law that an employee's "subjective

expectation of continued employment d[oes] not spawn a property or liberty interest

activating protectable procedural due process rights." *Skrocki v. Caltabiano*, 505 F. Supp.

916, 919 (E.D. Pa. 1981). Indeed, "[t]he decisional law is clear that an at-will employee

does not have a legitimate entitlement to continued employment because [he] serves solely

at the pleasure of [his] employer." *Elmore*, 399 F.3d at 282; *see also Biliski v. Red Clay*

*Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 219 (3d Cir. 2009) ("[A]n at-will employee

has no property interest in [his or her] job sufficient to trigger due process concerns.")

(internal citation and quotation marks omitted). Equally clear is that, contrary to Rink's

interpretation, Section 10-1089 of the School Code does not provide a business manager

with employment for life absent misconduct. *See Knox*, 888 A.2d at 640. Because the

Court concludes that Rink lacked a property interest in his continued employment, Defendants' Motion for Summary Judgment with respect to Count II will be granted.[13]

## D. Civil Conspiracy

Finally, the Court will address Rink's civil conspiracy claim alleged in Count III. "A civil conspiracy is [a] combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." *Ammulung v. City of Chester*, 494 F.2d 811, 814 (3d Cir. 1974) (citations omitted). In order to demonstrate a civil conspiracy pursuant to § 1983, Rink must demonstrate that "(1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right ." *Robinson v. Erik Hicks*, No. 1:07-CV-1751, 2010 WL 5697139, at * 15 (M.D. Pa. Dec. 2, 2010) (citing *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010)). "A claim for civil conspiracy must also be predicated upon an underlying tort that would be independently actionable by a single defendant." *Deritis v. Rogers*, Civil Action No. 13-6212, 2016 WL 739015, at *8 (E.D. Pa. Feb. 24, 2016). (internal citation and quotation marks omitted). "[A] conspiracy claim is not actionable without an actual violation of section 1983." *Holt Cargo Sys., Inc. v. Delaware River Port*

---

[13] In any event, even if the statute applied on these facts, Rink's claimed deprivation of his procedural due process rights would fail. It is undisputed that Rink declined to attend his hearing. And it is well settled that "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Id.* Thus, Rink's failure to attend the hearing belies his claimed deprivation of due process rights.

*Auth.*, 20 F. Supp. 2d. 803, 843 (E.D. Pa. 1998) (internal citation and quotation marks

omitted). Because Rink has failed to demonstrate conduct that deprived him of a federal

constitutional or statutory right actionable under § 1983, it necessarily follows that his §

1983 civil conspiracy claim must also fail. Therefore, the Court will grant Defendants'

Motion for Summary Judgment on Count III.[14]

## V.    **CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment will be

granted in its entirety. A separate order follows.

Robert D. Mariani
United States District Judge

---

[14] Because the Court is granting Defendants' Motion for Summary Judgment in its entirety, it need
not address Defendants' arguments regarding qualified immunity, punitive damages, and certain of the
individual defendants. (Doc. 54, at 16-19, 21-27).